UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | 04-10364-NMG |
| V. | ) | |
| SHAWN WINBUSH | ) | |

GOVERNMENT'S MEMORANDUM IN
OPPOSITION TO WINBUSH'S MOTION TO SUPPRESS

The United States respectfully opposes defendant Winbush's motion to suppress.

I.   **Facts**

The following facts were known to the government prior to the time that Shawn Winbush was authorized for transport to the hospital:

Customs and Border Protection (CBP) officers found approximately 105 pellets of cocaine hidden in a false bottom of the luggage of Courtney Mighty, a passenger on a flight from Jamaica on October 6, 2004.  Officers found an additional 4 pellets in a pants pocket within the bag.  The pellets, approximately 10 grams each, were tightly wrapped inside of condoms, consistent with the wrapping used for internal narcotics couriers.  Jamaica is a recognized source country for cocaine.  Mighty admitted that the bag was his and admitted that he had ingested pellets of cocaine.  Special Agents for Immigration and Customs Enforcement (ICE) were contacted, and they participated in the interview of Mighty.  Mighty told the ICE agents that his traveling companion, Shawn Winbush, had also ingested the pellets of cocaine.

While Mighty was being interviewed, Shawn Winbush was located and interviewed by Customs and Border Protection (CBP) officers.  Separate and apart from the statements by Courtney Mighty, inspectors were able to determine from customs travel reports that Winbush and Mighty were traveling together.  Winbush confirmed this as well.  Travel documents showed

that Mighty lived with Winbush, and that Mighty and Winbush had traveled to Jamaica together previously.  Winbush denied that Mighty lived with him.  ICE agents joined the interview of Winbush after Mighty told them that Winbush had also swallowed cocaine pellets.  They read Winbush his Miranda rights, and he signed a waiver.  Winbush was asked whether he was an internal courier, and he denied it.  Winbush signed a consent for an x-ray in order to prove it.  See Exhibit 1, attached.  CBP officers made the following observations about Winbush:  he had very dry lips and was using lip balm frequently; he was drinking large quantities of water; he belched loudly, he was sweating profusely, and he appeared agitated.   Defendant does not dispute that he displayed these symptoms.  See Affidavit of Shawn Winbush dated March 4, 2005.  The CBP supervisor contacted the Port Director for authorization to transport Winbush to the hospital for the x-ray, and authorization was given.  From the time that Winbush was located for interview through the time that he was transported to the hospital was more than 2 hours.  Under CBP rules, CBP officers who detained a passenger for 2 hours after a pat-down search offer to make a telephone call for the passenger.  Winbush asked that CBP contact his wife, Wendy Winbush, and they did so.  See Affidavit of Craig McPherson, passim.

      When Winbush was about to be transported to the hospital transport, he questioned why he should cooperate.  He stated that if he was going to be arrested either way, he may as well just refuse.  CBP officers then explained that if Winbush agreed to an x-ray and his x-ray was negative, he would be returned to the airport, and CBP would make arrangements for his transport home.  Winbush was also told that if he did not consent, he would still be transported to the medical facility for a monitored bowel movement, and this could take an indeterminate amount of time. CBP officer Craig McPherson told Winbush that the quicker way was to be x-rayed, but that the process was being delayed by Winbush's balking.  Winbush then said "Ok,

2

let's go." The legs of Winbush's pants were taped shut in order to prevent the removal or loss of contraband, and he was transported to Whidden hospital in Everett. At the hospital, Winbush was x-rayed. Medical personnel indicated that the x-ray was positive for foreign bodies. At that point, Winbush told CBP officers that "you got me." See McPherson affidavit.

## II. ARGUMENT

### A. **The X-Ray was Lawful**

#### 1. Consent Was Present

The CBP officers who arranged for Winbush's transport assert that Winbush consented to the x-ray and did not ultimately withdraw his consent. Affidavit of Craig McPherson, attached as Exhibit 2. ICE Special Agent Eric LaForte averred that Winbush had withdrawn his consent, and that McPherson had obtained authorization to obtain an involuntary x-ray. However, LaForte now asserts that he misunderstood, and he asserts that he does not know whether Winbush withdrew his consent or not. He further states that Winbush objected to going to the hospital, not to the x-ray. Affidavit of Eric LaForte, attached as Exhibit 3. Cf. United States v. Aguebor, 166 F.3d 1210, 1999 WL 5110 (4th Cir. Jan 04, 1999) (NO. 98-4258) (holding that customs officials' admonition that if passenger did not consent to x-ray, officials would detain passenger to seek court authorization for x-ray did not render consent involuntary, but holding as a secondary matter that involuntary x-ray would still have been lawful) with United States v. Pino, 729 F.2d 1357 (11th Cir. 1984)(noting that consent to an x-ray is always a Hobson's choice, because in the absence of consent, the passenger will be involuntarily detained). Accordingly, the government asserts that Winbush did not withdraw his consent, and the x-ray was thus voluntary.

However, given the confusion of the record on this point caused by the government's

3

initial submission, the government recognizes that the Court may determine that the voluntariness of the x-ray is at least in question. While an evidentiary hearing is often appropriate to resolve questions of fact, in this case, no hearing is needed. As demonstrated below, the x-ray was a valid exercise of border search authority as a matter of law, regardless of whether the defendant consented, and regardless of whether that consent was valid. Accordingly, the government asserts that the motion to suppress should be denied.

2.  The X-Ray was an Appropriate Exercise of Border Search Authority

In <u>United States v. Montoya de Hernandez</u>, 473 U.S. 531, 538 (1985), the Supreme Court addressed the level of suspicion required to detain an airline passenger suspected of being an internal narcotics courier. In that case, a female passenger who was suspected of being an internal courier (or "balloon swallower," <u>id</u>. at 534), had agreed to be x-rayed but withdrew her consent because she did not wish to be handcuffed in transport to the hospital. <u>Id.</u> Instead, she was eventually involuntarily subjected to a court-ordered rectal examination. <u>Id</u>. at 535-36. The Supreme Court determined that the involuntary rectal examination was appropriate, and set forth the standards for detention of persons at the border. "Routine searches of the persons and effects of entrants [at the international border] are no subject to any requirement of reasonable suspicion, probably cause, or warrant." <u>United States v. Montoya de Hernandez</u>, 473 U.S. 531, 538 (1985). Detention of a traveler beyond the scope of a routine search is justified "if customs agents, considering all the facts surrounding the traveler and her trip, reasonably suspect that the traveler is smuggling contraband in her alimentary canal." <u>Id.</u> at 541.

The First Circuit expanded on this standard in <u>United States v. Uricoechea-Casallas</u>, 946 F.2d 162 (1st Cir. 1991):

> [P]robable cause is not required to conduct routine border inspections or customs searches. This Court has adopted the "no suspicion" and "reasonable suspicion"

4

standards for reviewing such searches.  Under the "no suspicion" standard applicable to routine border searches, a customs officer may search an individual based on "'subjective suspicion alone, or even on random basis.  Where a search is not routine (e.g. a strip search), we have applied the reasonable suspicion standard.  United States v. Wardlaw, 576 F.2d 932 (1st Cir. 1978).  Under this standard, a border search of an individual's person is lawful if the government can "demonstrate some objective, articulable facts that justify the intrusion as to the particular person and place searched."  Braks, 842 F.2d at 513 (citing United States v. Afanador, 567 F.2d 1325, 1328 (5th Cir. 1978)).

946 F.2d at 166.

An x-ray likely falls within the category of "nonroutine" searches.  In Montoya de Hernandez, the Supreme Court expressly declined to determine what standard applied to "nonroutine body searches such as strip, body cavity, or involuntary x-ray searches."  Id. at 541 n.4.  The First Circuit has noted that the only type of search which has been consistently held to be non-routine is a strip-search or body cavity search.  United States v. Braks, 842 F.2d 509, 511-13 (1st Cir. 1988).  Nonetheless, in a 1988 case involving a search in which a female airline passenger was ordered to lift her clothing, the First Circuit surveyed the law applicable to border searches post-Montoya de Hernandez, and adopted a flexible standard for determining the degree of suspicion which is necessary to justify a search, depending on the degree of invasiveness.  See Braks, 842 F.2d at 511-13.  The First Circuit noted the following factors are relevant in that review:

    (i)    whether the search results in the exposure of intimate body parts or requires the suspect to disrobe;
    (ii)    whether physical contact between Customs officials and the suspect occurs during the search;
    (iii)    whether force is used to effect the search;
    (iv)    whether the type of search exposes the suspect to pain or danger;
    (v)    the overall manner in which the search is conducted; and
    (vi)    whether the suspect's reasonable expectations of privacy, if any, are abrogated by the search.

Id.

Applying these factors to the Winbush x-ray, the x-ray was lawful. In Winbush's circumstances, the level of suspicion was high. Mighty had confessed to customs officers that he had ingested several cocaine pellets like the ones that were found in his luggage, and Mighty told them that Winbush had also ingested the pellets. As corroboration, customs officers knew that Winbush was traveling with Mighty from Jamaica, a country known to be a cocaine source, and had traveled with Mighty to Jamaica earlier in the year. The cocaine pellets were packaged in a manner that appeared to experienced customs agents that they had been prepared for the purpose of internal smuggling. Winbush manifested dry lips, drank large quantities of water, sweated profusely and appeared agitated, all signs that an experienced customs inspector would recognize as consistent with internal drug smuggling. Therefore, the customs personnel had a high level of particularized suspicion that Winbush was an internal narcotics smuggler.

While the level of suspicion was high, the level of intrusion was minimal. Agents had a right to simply leave Winbush in a room for whatever time was required to have a monitored bowel movement into a garbage can.[1] Montoya de Hernandez, 473 U.S. at 543-44. While such detention would undoubtedly be "long, uncomfortable, indeed, humiliating," id. at 544, and would ultimately "result in the exposure of intimate body parts," Braks, 842 F.2d at 512, to accomplish, it was fully within their power. See Montoya, 473 U.S. at 543-44. Instead, the agents took Winbush to a hospital, where, while clothed, he would be subject to a standard medical procedure, performed by medical personnel, that did not require physical contact or invasion of intimate body parts. See also United States v. Vega-Barvo, 729 F.2d 1341, 1346-48 (11th Cir. 1984) (noting that x-ray does not subject individual to the indignity of the rectal probe

---

[1] However, local Customs policy is that monitored bowel movements will take place at a hospital.

6

at issue in Montoya, and therefore the level of suspicion required to perform them is low); United States v. Pino, 729 F.2d 1357 (11th Cir. 1984) (noting that x-rays can be performed with a lower level of suspicion than a rectal exam). Therefore, balancing the intrusion against the invasion, the x-ray of Winbush was lawful, whether or not it was voluntary, and the evidence should not be suppressed.

      **B.     Even if the X-Ray were Unlawful, the Rule of Inevitable discovery applies.**

Even if the Court were to determine that the x-ray was involuntary, the results should be admissible under the rule of inevitable discovery. See United States v. Scott, 270 F.3d 30, 43-45 (1st Cir. 2001). Under Montoya de Hernandez, 473 U.S. at 543-44, it is clear that if a passenger suspected of internal smuggling cannot or will not be x-rayed, the customs inspectors have the right to "detain [the passenger] for such time as necessary to confirm their suspicions" through a monitored bowel movement. Id. at 543. They have no obligation to turn the passenger "loose into the interior carrying the reasonably suspected contraband drugs." Id. at 543. See United States v. Pino, 729 F.2d 1357 (11th Cir. 1984) (noting that the choice to have an x-ray is a Hobson's choice, because "in the absence of consent, the agents can detain you until nature reveals the truth or falsity of their suspicions.")

                                                      Respectfully Submitted,

                                                      MICHAEL J. SULLIVAN
                                                    United States Attorney

                               By:    /s/Nancy Rue
                                        Nancy Rue
                                        Assistant U.S. Attorney