UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA )
)
V. )
) No.  04-10364-NMG
)
SHAWN WINBUSH, )
)
      Defendant. )

**AFFIDAVIT OF CUSTOMS & BORDER PROTECTION OFFICER CRAIG MCPHERSON**

I, Craig McPherson, on oath depose and state:

1. I am a Customs and Border Protection officer, and I have been employed in that capacity (or with the predecessor agency, United States Customs Service) since 1996.

2. On October 6, 2004, I was on duty at Logan Airport. At that time, I was the Acting Supervising Customs Inspector, and I was serving in that capacity with regard to the events surrounding Shawn Winbush's interview. The primary officers involved in that interview were CBP Officer Paul Ryan and CBP Officer Simon Amaral. I conferred with them that night in my capacity as Acting Supervisor, and I have spoken with them in the course of preparing this affidavit. This affidavit therefore includes both my own personal recollection of these events as well as my understanding based on my discussions with these two primary officers.

3. Customs and Border Protection (CBP) officers found approximately 105 pellets of cocaine hidden in a false bottom of

the luggage of Courtney Mighty, a passenger on a flight from Jamaica on October 6, 2004. Officers found an additional 4 pellets in a pants pocket within the bag. The pellets, approximately 10 grams each, were tightly wrapped inside of condoms, consistent with the wrapping used for internal narcotics couriers. Jamaica is a recognized source country for cocaine. Mighty admitted that the bag was his and admitted that he had ingested pellets of cocaine. Special Agents for Immigration and Customs Enforcement (ICE) were contacted, and they participated in the interview of Mighty.

4. Mighty told the ICE agents that his traveling companion, Shawn Winbush, had also ingested the pellets of cocaine.

5. While Mighty was being interviewed, Shawn Winbush was located and interviewed by Customs and Border Protection (CBP) officers. Winbush confirmed that he had been traveling from Jamaica with Mighty. Winbush denied that Mighty lived with him. ICE agents joined the interview of Winbush after Mighty told them that Winbush had also swallowed cocaine pellets. They read Winbush his Miranda rights, and he signed a waiver of those rights. Winbush was asked whether he was an internal courier, and he denied it. Winbush signed a consent for an x-ray. See Exhibit 1, attached.

6. CBP officers made the following observations about

Winbush:  he had very dry lips and was using lip balm frequently; he was drinking large quantities of water; he belched loudly, he was sweating profusely, and he appeared agitated.  The CBP supervisor contacted the Port Director for authorization to transport Winbush to the hospital for the x-ray, and authorization was given.

7.    From the time that Winbush was located for interview through the time that he was transported to the hospital was more than 2 hours.  Under CBP procedures, CBP officers who have conducted a personal search of a passenger will offer to make a telephone call on behalf of that passenger if the exam continues more than two hours.  Winbush asked that CBP contact his wife, Wendy Winbush, and they did so.

8.    When Winbush was about to be transported to the hospital, he asked CBP officers why he should cooperate.  He indicated to the CBP officers that the ICE agents had stated that he was going to be arrested either way, and so he was confused about the process.  He appeared agitated and became uncooperative after being interviewed by ICE.  He stated that he did not know who to trust or believe, and he lay down on a bench in the interview room.

9.    CBP Officer Paul Ryan then told Winbush that he had the right to refuse to have an x-ray, and that he could revoke his consent at any time.  I then explained that if Winbush agreed to

an x-ray and his x-ray was negative, he would be returned to the airport, and CBP would make arrangements for his transport home. I asserted that he may still face criminal charges in the future based on the pellets found with his traveling companion, even if his own x-ray was negative, but that that decision rested with ICE. I also told Winbush that even if he did not consent to the x-ray, he would still be transported to the medical facility -- I told him he had no choice about going. He either would go for a monitored bowel movement or for the x-ray.

9. During the course of these explanations, Winbush relaxed. He became calm and again appeared cooperative. At the close of this discussion, Winbush then said "Ok, let's go," and he made no further objections to the x-ray process. It was my understanding that Winbush was not objecting to the x-ray and that he had decided not to revoke his consent. The legs of Winbush's pants were taped shut in order to prevent the removal or loss of contraband, and he was handcuffed and transported to Whidden hospital in Everett. When entering the hospital, hospital staff conducted the admission process. After that was complete, a physician evaluated Winbush, and Winbush was taken to the x-ray unit of the hospital by the physician. At no point during this process did he object to the x-ray. The physician supervised the x-ray and read it when it was complete. The physician stated "He's loaded," and at that point, Winbush

stated, "I lied, you got me."

FURTHER AFFIANT SAYETH NAUGHT.

Signed under pains and penalties of perjury.

*[signature]*
Craig McPherson
Customs and Border Protection Officer