UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA  )
            Plaintiff  )
                       )  Cr.# 04-10364-NMG
     v.                )
                       )
SHAWN WINBUSH          )
            Defendant  )
_____ )

**SENTENCING MEMORANDUM OF DEFENDANT PURSUANT
TO F.R.Cr.P. RULE 32(a)(C) and 18 U.S.C. § 3553(a)**

*It has been uniform and constant in the federal judicial
tradition for the sentencing judge to consider every
convicted person as an individual and every case as a
unique study in the human failings that sometimes
mitigate, sometimes magnify, the crime and the punishment
to ensue.*
     United States v. Koon, 518 U.S. 81, 113 (1996)

This memorandum is being submitted to assist this
Honorable Court in its determination of the most appropriate
sentence for Mr. WINBUSH by addressing each of the available
sentencing options under the provisions of 18 U.S.C. § 3553(a),
inclusive of any consideration of the  United States Sentencing
Guidelines.

Following United States v. Booker 543 U.S. __ , 125 S. Ct.
738 (2005) and Blakely v. Washington, 542 U.S. ___ , 124 S.
Ct. 2531 (2004)  this Honorable Court has broad discretion in
determining an appropriate sentence.  Recently, the First
Circuit, commenting on *Booker,* noted that "[t]hat surgical
strike rendered the guidelines advisory and freed sentencing
courts to tailor individual sentences in light of the factors

1

enumerated in 18 U.S.C. § 3553(a). This means that district courts now possess greater flexibility in reaching individual sentencing decisions " <u>United States v. Pho</u>, 2006 U.S. App. Lexis 153 (23-24), *citation and footnote omitted.*

Before the Court is a 38 year old man, father of four, a U.S. Army veteran, a previous victim of violent crime, and an individual with a major history of depression and psychological treatment. Mr. WINBUSH has plead guilty to a serious drug offense, importing cocaine into the country by way of being an internal courier. The manner in which he made this attempt, swallowing balloons filled with cocaine, almost killed him. He spent several days in the hospital following his arrest. With his psychological history, it appears that the high risk in which this activity was carried out manifested Mr. WINBUSH's continuing depression because, in essence, it was nothing less than a death wish.

**SENTENCING OPTIONS**

This Honorable Court is free to look at **all** the factors of 18 U.S.C. § 3553(a) in imposing a "reasonable sentence" that is "sufficient, but not necessary to comply with the purposes set forth [ in this provision greater than ]." While § 3553(a)(4) requires the Court to consider the Guideline ranges, "it permits the court to tailor the sentence in light of other statutory concerns as well, <u>see</u> § 3553(a)." *Booker,* Breyer, J. 125 S.Ct. at 757.

This sentencing approach is consistent with the view that was expressed by Justice Kennedy in his 2003 speech to the

American Bar Association when he openly commented on the unfair severity of federal sentences: "Our resources are misspent, our punishments too severe, our sentences too long....In the federal system the sentencing guidelines are responsible in part for the increase in prison terms....**The Federal Sentencing Guidelines should be revised downward**...(*emphasis added.)*"

While under 18 U.S.C. § 3553(a) the Court must consider various factors prior to the imposition of sentence including the kinds of sentences available under the United Sentencing Guidelines, the Court must also consider other factors that may give rise to a departure from the Guidelines or factors in mitigation that are in variance with the Guidelines.

In <u>United States v. Wilkerson</u>, 183 F.Supp. 2d 373,375 (D.C. Mass. 2002)  Judge Gertner observed that,:

> The Supreme Court in <u>Koon</u> directed the district court to "make a refined assessment of the many facts bearing on the outcome, informed by its vantage point and day-to-day experience in criminal sentencing." *518 U.S. at 98.* Plainly, in order to make a departure determination, the Court must have a perspective independent of the Guidelines -- all the facts the case involves, and not just those facts made relevant by the Guidelines.

**THE SENTENCING FACTORS**

1. *The nature and circumstances of the offense*, 18 U.S.C. § 3553(a)(1).  In the case at bar, Mr. WINBUSH, a life long drug user,  participated in one of the most common federal offenses, that being a serious drug offense.  As an internal "swallower" Mr. WINBUSH, along with his co-defendant, is responsible for a total amount of approximately 2.4 kilograms of cocaine, a

3

relatively small level offender.  He participated in the offense in support of his own habit and addiction. On October 6, 2004 Mr. WINBUSH arrived at Logan International Airport from Montego Bay, Jamaica.  Questioning and x-rays revealed that Mr. WINBUSH was an internal courier for a narcotic substance. During Mr. WINBUSH's questioning and prior to the x-ray, agents observed him to exhibit signs of distress associated with the ingestion of a foreign substance: dry lips, continuous use of lip balm, drinking large quantities of water, burping frequently, sweating profusely and appeared extremely agitated. In addition medical testing revealed the presence of cocaine in his system.  Mr. WINBUSH was taken to the intensive care unit for fear that a pellet had leaked or otherwise been compromised.  The substance found within his body cavities was analyzed and determined to be 332.5 grams of cocaine hydrochloride.

Drug offences make up approximately a third of federal prosecutions according to the Bureau of Justice statistics. "From October 1, 2000, to September 30, 2001, there were 12,457 Federal drug arrests for cocaine, representing 37% of all Federal drug arrests. Of those arrested by Federal agents for cocaine, 40% were white and 59% were black." http://www.whitehousedrugpolicy.gov/publications.

"According to a 1997 Bureau of Justice Statistics survey of Federal and State prisoners, approximately 65.5% of Federal and 72.1% of State drug offenders were incarcerated for a cocaine offense." Id.

1B.  *The history and characteristics of the defendant* .

Mr. WINBUSH is a 38 year old U.S. citizen, veteran of the peacetime and Gulf War Era, who was raised in impoverished and physically abusive conditions.  PSR ¶'s 61 -68.  By the time he was 16 years old he was kicked out of the home, he was poorly educated and was well into the use and abuse of alcohol and marihuana.  As he grew older his substance abuse increased and the substances used became more dangerous i.e., cocaine and heroin.  PSR ¶ 104 -106.  Mr. WINBUSH used drugs until he was arrested for the instant offense.  In addition Mr. WINBUSH is the victim of a violent crime. In 1998 he was robbed and kidnaped and thrown out of a speeding vehicle on Route 24.  To this day he bears the physical scars (injury to the head) and the emotional consequences that occurred as a result thereof.

II.  The need for the sentence "to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense," adequate deterrence, and to protect the public.

Mr. WINBUSH  stands convicted of a serious felony drug conviction which mandates a minimum of 5 years incarceration.

III  The need "to provide the defendant with needed educational or vocational training."   The instant offense and its consequences are themselves an unforgiving education.  It is

clear that Mr. WINBUSH is also in need of further training
and/or education.  He has a GED which he obtained in 1998.  At
an early age and with minimal education he was kicked out of
his maternal home and left to his own devices.   Mr. WINBUSH
also acknowledges his need for drug treatment.  Mr. WINBUSH
almost died from his foolish endeavor.  Mr. WINBUSH would
benefit from a recommendation to the BOP's 500 hour drug
treatment program. According to White House drug policy the
"BOP conducted a survey of drug treatment outcomes among
inmates who were released no later than December 31, 1995, and
who completed the residential drug abuse treatment program. The
survey found that only 3.3% were likely to be rearrested in the
first 6 months after release, compared with 12.1% of inmates
who did not receive treatment. Similarly, among those who
received treatment, 20.5% were likely to use drugs in the first
6 months after release. In the group without treatment, 36.7%
used drugs during post release." Id.

> There is no magic bullet to eradicate drug abuse. Drugs
> purport to provide an instant answer to boredom, anxiety
> or pain. But the solution to the drug problem for the
> individual and the country is anything but instant.
> Treating drug addiction requires patience, compassion, and
> a will to carry on.

Barry McCaffrey, Director, Office of National Drug Control
Policy

 IV. The applicable category of offense under the Advisory
Guidelines.

        Mr. WINBUSH respectfully submits that any consideration of
the Sentencing Guidelines should take into account the
following advisory guideline provisions:

| | |
|---|---|
| **Base Offense Level**, U.S.S.G. § 2D1.1( c)(6) | **28** |
| Adjusted offense level in the absence of career offender provision | 25 |
| Criminal History V                                100-125 months | |
| **Career Offender Guideline**    U.S.S.G. § 4B1.1(b)(D) | 34 |
| **Acceptance of Responsibility** | -3 |
| **Total Offense Level** | 31 |
| **Criminal History Category** U.S.S.G. §4B1.1(b) | **VI** |
| **Applicable Guideline Range**          **(Level 31)  188-235 months** | |

## FACTORS IN MITIGATION

There is little question that in Mr. WINBUSH's case, there exist extraordinary circumstances within the meaning of 18 U.S.C. § 3553(a) and U.S.S.G. § 5K2.0, that evidence factors in mitigation and remove this case from the "heartland" of cases. As set forth in the objections to the PSR such factors include the following:.

**Decorated military service**.  Mr. WINBUSH has served over 10 years in the active military and reserves. He has two achievement medals as well as other medals.  See attached.

**Lack of Youthful Guidance**.  Mr. WINBUSH came from an abusive broken family. He was "kicked" out of his home when he was 16

7

and thereafter joined the Army Reserves. His mother reports
that she feels Mr. WINBUSH's actions are a result "of the way
he was treated by his father. PSR ¶s 62-68.


**<u>Victim of violent crime</u>**.  Mr. WINBUSH was kidnapped, robbed
and thrown out of a speeding vehicle resulting in a serious
head injury.  <u>See</u> attached


**<u>Overstatement of Criminal History</u>**.   Mr. WINBUSH has had a
history of Massachusetts district court offenses that has
resulted in small jail sentences.  All said offenses evidence
how his prior history of substance abuse kept him from making
rational choices. On the other hand, Mr. WINBUSH's guideline
criminal history category, to the extent it is considered,
over-represents the seriousness of his criminal history and his
likelihood of recidivism.  Although he has a long criminal
history, most of the offenses involved marijuana and other
drugs and none involved serious acts of violence.  All the
offense seem to arise from his own substance abuse problem.  As
set forth herein, given appropriate mental health and drug
treatment, Mr. WINBUSHS chances of recidivism are greatly
reduced.

        According to Forensic Psychologist Frank DiCataldo, who
has studied and written on recidivism: "The best risk
management approach to lower future criminality is the
provision of treatment services that will provide relapse

prevention for substance abuse **and psychiatric treatment** for mood symptoms" ... A comprehensive treatment plan that includes vocational training, addiction services *and mental health treatment* is clearly the best way to prevent future offending."

U.S.S.G. § 4A1.3 recognizes the "imperfection" of the categorical approach to assessing criminal history, and specifically provides a mechanism for, and *encouraging*, the courts to depart when a "defendant's criminal history [is] significantly less serious than that of most defendants in the same criminal history category..."  See also U.S.S.G §.4A1.1, Background note.  As set forth above, although Mr. WINBUSH's has a criminal history, it only involves street crimes, not crimes of serious violence and is not unlike a criminal record of similarly situated drug addicts.  His record as a whole is significantly less serious than most other  Category VI offenders.

> [T]o qualify for this departure, unlike departures in Chapter 5, the Court does not have to find that there is something atypical about the record. Specifically, the court does not have to find that "there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission." *18 U.S.C. § 3553*(b). The statutory authority for the  promulgation of U.S.S.G. § 4A1.3 lies not in *18 U.S.C. § 3553*(b), the departure authority, but "in the basic provision of the Sentencing Reform Act that gives the Commission the authority ... to take into account, where relevant, the defendant's criminal background," United States v. Shoupe, 988 F.2d 440, 446 (3d Cir. 1993)
>
> ....
>
> Judges have considered the relationship between the specific offenses and drug use, notwithstanding U.S.S.G. § 5H1.4. As Judge Weinstein noted in describing a

defendant's record, as a basis for a downward departure, "his prior arrests result from minor drug crimes involving facilitation of the sale of drugs and the kind of petty criminality associated with a poor addict's attempt to acquire money for the purchase of narcotics." <u>United States v. Hammond</u>, 37 F. Supp. 2d 204, 205 (E.D.N.Y. 1999).

<u>United States v. Wilkerson</u>, <u>supra</u> at 380.

Mr. WINBUSH's criminal history, and addict background, does not evidence an individual likely to commit further serious crimes or crimes of violence and thus fits squarely with those cases where departures on the basis of overstatement of criminal history have been granted.

**Mental Health.** U.S.S.G. § 5K2.13  Mr. WINBUSH has a long history of depression and mood disorders.  Mr. WINBUSH is in need of comprehensive treatment that will address his mental health and substance dependence needs.  There is little question that his "mood disorder", is a mitigating factor that contributed to the offense.

Even if any one circumstance does not give rise to a reason for a reduction from the advisory Sentencing Guidelines to the sentence suggested, **the totality of circumstances** "may well converge to create the unusual situation not contemplated by the Commission." <u>United States v. Iaconetti</u>, 59 F.Supp. 2d 139 (D.C. Mass 1999); <u>United States v.Parham</u>, 16 F.3d 844 (8th Cir.1994).

10

Consistent with the sentiment expressed above and the reasons stated herein, Mr. WINBUSH respectfully requests that this Honorable Court consider a sentence of the mandatory minimum of five years.  It is a lengthy term of incarceration that will meet all the factors in § 3553(a) and be a sentence that is sufficient but not greater than necessary to carry out its provisions.

## CONCLUSION

WHEREFORE, defendant SHAWN WINBUSH respectfully requests this Honorable Court to sentence him to the mandatory minimum term of 60 months incarceration years with three years of supervised release . He further requests that the Court find that he has no ability to pay a fine.  Such a reasonable sentence would be warranted in the interest of justice.

Date: February 21, 2006          Respectfully submitted,

*S/Victoria M. Bonilla*

VICTORIA M. BONILLA, BBO # 558750
77 Central Street, 2nd Floor
Boston, MA 02109
(617) 350-6565

Attorney for Defendant
SHAWN WINBUSH

Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants.          *S/ Victoria M. Bonilla*

11



Department of the Army
Office of Recruiting Command
450 Concord Av.
Cambridge MA, 02138

MEMORANDUM OF REQUEST                                    September 14, 2004

To Whom It May Concern:
For informational purpose only, Shawn Winbush is a member of the Massachusetts Army
National Guard. He has been a member for over ten years, he is now serving a tour of
enlistment that will end on the August 2005. His drill status runs for one weekend a
month and two weeks a year for the remainder of his enlistment. For any additional
questions you can contact me at the Cambridge Recruiting office.
Please if you have any question feel free to give me a call.

Claudy E Charles, SSG
MA ARNG
Cambridge Recruiting Office
(617) 593- 3794

CAUTION: NOT TO BE USED FOR IDENTIFICATION PURPOSES — THIS IS AN IMPORTANT RECORD. SAFEGUARD IT. — ANY ALTERATIONS IN SHADED AREAS RENDER FORM VOID

## CERTIFICATE OF RELEASE OR DISCHARGE FROM ACTIVE DUTY

| 1. NAME (Last, First, Middle) | 2. DEPARTMENT, COMPONENT AND BRANCH | 3. SOCIAL SECURITY NO. |
|---|---|---|
| WINBUSH, SHAWN ROBERT | ARMY/ARNG | 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 |

| 4.a GRADE, RATE OR RANK | 4.b PAY GRADE | 5. DATE OF BIRTH (YYYYMMDD) | 6. RESERVE OBLIG. TERM. DATE | | |
|---|---|---|---|---|---|
| SPC | E4 | 19670105 | Year 0000 | Month 00 | Day 00 |

| 7.a PLACE OF ENTRY INTO ACTIVE DUTY | 7.b HOME OF RECORD AT TIME OF ENTRY (City and state, or complete address if known) |
|---|---|
| PITTSFIELD, MA | 13 HAZZARD CT NEW BEDFORD, MA 02740 |

| 8.a LAST DUTY ASSIGNMENT AND MAJOR COMMAND | 8.b STATION WHERE SEPARATED |
|---|---|
| CO B INSTALLATION SPT BN FC | FORT DIX, NJ 08640-5089 |

| 9. COMMAND TO WHICH TRANSFERRED | 10 SGLI COVERAGE | None |
|---|---|---|
| COMPANY A 1/104TH INFANTRY BATTALION (LT) GREENFIELD, MA 01301 | Amount: $ 250,000.00 | |

| 11. PRIMARY SPECIALTY (List number, title and years and months in specialty. List additional specialty numbers and titles involving periods of one or more years.) | 12. RECORD OF SERVICE | Year(s) | Month(s) | Day(s) |
|---|---|---|---|---|
| 11B10 00 INFANTRYMAN--1 YRS-11 MOS//NOTHING FOLLOWS | a. Date entered AD This Period | 2002 | 09 | 03 |
| | b. Separation Date This Period | 2003 | 09 | 02 |
| | c. Net Active Service This Period | 0001 | 00 | 00 |
| | d. Total Prior Active Service | 0000 | 01 | 01 |
| | e. Total Prior Inactive Service | 0012 | 08 | 12 |
| | f. Foreign Service | 0000 | 00 | 00 |
| | g. Sea Service | 0000 | 00 | 00 |
| | h. Effective Date of Pay Grade | 2001 | 09 | 20 |

| 13. DECORATIONS, MEDALS, BADGES, CITATIONS AND CAMPAIGN RIBBONS AWARDED OR AUTHORIZED (All periods of service) |
|---|
| ARMY ACHIEVEMENT MEDAL (2ND AWARD)//ARMY RESERVE COMPONENTS ACHIEVEMENT MEDAL//NATIONAL DEFENSE SERVICE MEDAL (2ND AWARD)//ARMED FORCES RESERVE MEDAL W/"M" DEVICE//ARMY SERVICE RIBBON//NOTHING FOLLOWS |

| 14. MILITARY EDUCATION (Course title, number of weeks and month and year completed) |
|---|
| NONE//NOTHING FOLLOWS |

| 15.a MEMBER CONTRIBUTED TO POST-VIETNAM ERA VETERAN'S EDUCATIONAL ASSISTANCE PROGRAM | Yes | No | 15.b HIGH SCHOOL GRADUATE OR EQUIVALENT | Yes | No | 16. DAYS ACCRUED LEAVE PAID |
|---|---|---|---|---|---|---|
| | | X | | X | | 30.5 |

| 17. MEMBER WAS PROVIDED A COMPLETE DENTAL EXAM AND ALL APPROPRIATE DENTAL SERVICES AND TREATMENT WITHIN 90 DAYS PRIOR TO SEPARATION | Yes | X | No |
|---|---|---|---|

| 18. REMARKS |
|---|
| DATA HEREIN SUBJECT TO COMPUTER MATCHING WITHIN DOD OR WITH OTHER AGENCIES FOR VERIFICATION PURPOSES AND DETERMINING ELIGIBILITY OR COMPLIANCE FOR FEDERAL BENEFITS//ITEM 12D ABOVE DOES NOT ACCOUNT FOR ANNUAL AND/OR WEEKEND TRAINING THIS SOLDIER MAY HAVE ACCOMPLISHED PRIOR TO DATE ENTERED IN ITEM #12A//INDIVIDUAL COMPLETED PERIOD FOR WHICH ORDERED TO ACTIVE DUTY FOR PURPOSE OF POST SERVICE BENEFITS AND ENTITLEMENTS//ORDERED TO ACTIVE DUTY IN SUPPORT OF OPERATION NOBLE EAGLE IAW 10 USC 12302//MEMBER HAS COMPLETED FIRST FULL TERM OF SERVICE //ORDERED TO ACTIVE DUTY IN RESPONSE TO THE WORLD TRADE CENTER AND PENTAGON ATTACKS//NOTHING FOLLOWS |

| 19.a MAILING ADDRESS AFTER SEPARATION (Include Zip Code) | 19.b NEAREST RELATIVE (Name and address - include Zip Code) |
|---|---|
| 13 HAZZARD CT NEW BEDFORD, MA 02740 | SHANNETTE M WINBUSH 13 HAZZARD CT NEW BEDFORD, MA 02740 |

| 20. MEMBER REQUESTS COPY 6 BE SENT TO (MA) DEPT OF VETERANS AFFAIRS | X | Yes | No | 22. OFFICIAL AUTHORIZED TO SIGN (Typed name, grade, title and signature) |
|---|---|---|---|---|
| 21. SIGNATURE OF MEMBER BEING SEPARATED | | | | THOMAS W. D AEROSCA, DIR, MILITARY PERSONNEL |

| SPECIAL ADDITIONAL INFORMATION (For use by authorized agencies only) |  |
|---|---|
| 23. TYPE OF SEPARATION | 24. CHARACTER OF SERVICE (Include upgrades) |
| RELEASE FROM ACTIVE DUTY | HONORABLE |
| 25. SEPARATION AUTHORITY | 26. SEPARATION CODE | 27. REENTRY CODE |
| AR 635-200, CHAP 4 | LBK | NA |
| 28. NARRATIVE REASON FOR SEPARATION | | |
| COMPLETION OF REQUIRED ACTIVE SERVICE | | |
| 29. DATES OF TIME LOST DURING THIS PERIOD | | 30. MEMBER REQUESTS COPY 4 |
| NONE | | Initials |

DD Form 214-AUTOMATED, NOV 88    Previous editions are obsolete.    MEMBER - 4



## DEPARTMENT OF VETERANS AFFAIRS
## REGIONAL OFFICE
## 8810 RIO SAN DIEGO DR.
## SAN DIEGO, CA 92108

### Shawn R. Winbush

### VA File Number
### 018 58 8160

### Rating Decision
### March 3, 2004

## INTRODUCTION

The records reflect that you are a veteran of the Peacetime and Gulf War Era. You served in the Army from August 8, 1984, to November 8, 1984, and from September 3, 2002, to September 2, 2003. You filed an original disability claim that was received on September 9, 2003. Based on a review of the evidence listed below, we have made the following decisions on your claim.

As stated in 38 CFR 3.400 (b)(2)(i), the effective date will be the day after service or date entitlement arose, which ever is later, if the claim is received within one year after separation from service. The effective date of September 3, 2003, is assigned as this is the day after service and your claim was received within one year of your separation from active duty.

## DECISION

Service connection for eating disorder, not otherwise specified, post-traumatic stress disorder is granted with an evaluation of 50 percent effective September 3, 2003.

## EVIDENCE

- VA Form 21-526 received on September 9, 2003
- VA duty to assist letter dated November 10, 2003
- Service medical records from June 24, 2003, through August 27, 2003, furnished by veteran
- Statement dated November 17, 2003, from Staff Sergeant Michael R. Devine, Plymouth, MA
- VA examinations dated December 5, 2003, and January 5, 2004

## REASONS FOR DECISION

### Service connection for eating disorder, not otherwise specified, post-traumatic stress disorder.

Service connection for eating disorder, not otherwise specified, post-traumatic stress disorder has been established as directly related to military service. Your service medical records showed that on June 25, 2003, you were seen for complaint of rapid weight loss, nausea, diarrhea, and general malaise x one month. On July 29, 2003, you were diagnosed with anorexia nervosa, with your weight dropping from 273 pounds to 183 pounds over a 3-4 month period through a combination of eating 1 meal a day or every other day, taking over the counter diet supplement and working out 2-3 hours daily to achieve weight loss. Staff Sergeant Devine, in his statement, confirmed that due to a weight loss program implemented in your military company newsletter in December 2002, soldiers that were overweight were allowed to go on pass only if they showed signs of improvement by losing 3 pounds or 3 percent of their body weight. This condition is evaluated as 50 percent disabling, effective September 3, 2003, based on findings at the VA exam. You reported hoarding food, eating very small amounts, and purging yourself with colon cleansers, which began when you were forced to lose weight during active duty. You reported racism and mistreatment regarding your weight during active duty causing you to fear for your physical safety and career security. You related currently having intrusive memories, flashbacks, and nightmares of your experiences in service. You related experiencing multiple symptoms of numbness and avoidance and several symptoms of hyper arousability, including difficulty managing your temper, sleeping, concentrating, and exaggerated startle response. You reported having marital difficulties due to your short temper. You also stated that once a week, something happens when dealing with the general public that causes you to lose your temper. You stated that you isolate yourself to avoid conflict and confrontation. You reported that your leisure activities and friendships are limited. Mental status examination showed a somewhat accelerated speech. You seem agitated and expressed a great deal of anger and frustration regarding your experiences during active duty. You were also appropriately tearful at times and your affect was mood congruent. You showed no grossly psychotic symptoms, and your eye contact was adequate. Your thought form was logical, coherent and appropriate. You denied active suicidal or homicidal ideations. Your mini-mental

status exam scores indicated moderate cognitive impairment, with errors consistent with your difficulty concentrating. You meet the criteria for post-traumatic stress disorder, with symptoms which are moderate in intensity, with an assigned GAF score of 51. You also meet all of the criteria for anorexia nervosa, except that despite significant weight loss, your current weight is in the normal range for your height. An evaluation of 50 percent is assigned for occupational and social impairment with reduced reliability and productivity due to such symptoms as: flattened affect; circumstantial, circumlocutory, or stereotyped speech; panic attacks more than once a week; difficulty in understanding complex commands; impairment of short- and long-term memory (e.g., retention of only highly learned material, forgetting to complete tasks); impaired judgment; impaired abstract thinking; disturbances of motivation and mood; difficulty in establishing and maintaining effective work and social relationships. A higher evaluation of 70 percent is not warranted unless there are deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood, due to such symptoms as: suicidal ideation; obsessional rituals which interfere with routine activities; speech intermittently illogical, obscure, or irrelevant; near-continuous panic or depression affecting the ability to function independently, appropriately and effectively; impaired impulse control (such as unprovoked irritability with periods of violence); spatial disorientation; neglect of personal appearance and hygiene; difficulty in adapting to stressful circumstances (including work or a worklike setting); inability to establish and maintain effective relationships. Your current impairment more closely approximates a level of 50 percent disabling.

You are not currently receiving any mental health treatment, but have expressed an interest in receiving help. VA examiner feels that if you receive treatment through medication and therapy, you will likely see some improvement in your symptoms. Since there is a likelihood of improvement, the assigned evaluation is not considered permanent and is subject to a future review examination.

## REFERENCES:

Title 38 of the Code of Federal Regulations, Pensions, Bonuses and Veterans' Relief contains the regulations of the Department of Veterans Affairs which govern entitlement to all veteran benefits. For additional information regarding applicable laws and regulations, please consult your local library, or visit us at our web site, www.va.gov.

PEMBROKE HOSPITAL

*A Division Of Westwood Pembroke Health System*

December 14, 2001

Sean Winbush has been treated at this clinic since 4/1/99. We have been treating Mr. Winbush for his Bipolar Disorder (most recent episode depressed 296.53). Mr. Winbush struggles with severe variability of mood that has in the past reached psychotic proportions. He has most recently struggled with a debilitating depression that has prevented him from attaining gainful employment.

Mr. Winbush has experienced for many years, a sleep disturbance (both insomnia and hypersomnia), severe anhedonia, weight gains and losses of over 10% of his body mass, periods of psychomotor agitation, periods of paranoia, which have left him housebound, feelings of worthlessness and hopelessness, a diminished capacity to concentrate and a chronic preoccupation with death.

Mr. Winbush's treatment at this clinic has included psychopharmacological therapy, individual psychotherapy and family therapy. He has come regularly has been active in his behalf in his treatment. Individual treatment has focused on the development of an understanding of his illness and the acquiring of the coping skills necessary to ameliorate the illnesses most debilitating symptoms. Mr. Winbush has also struggled with substance abuse which is often a comorbid disorder with Bipolar Disorder.

Psychopharmacologic treatment has focused on reducing his symptoms and has included mood stabilizing medications (Depakote, Lithobid and Neurotin) antidepressants (Celexa, Zoloft , Trazodone) and antipsychotic medications

Sean Winbush (cont'd)                    -2-

(Risperidol, Zyprexa) designed to target his agitation and paranoia.   The symptom of paranoia has produced the most chaos in his life and the lives of his wife and children.

Mr. Winbush's efforts have started to produce results. His Valproic Acid levels have been maintained in the therapeutic range consistently which has helped both his sleep pattern and his vulnerability  to substance abuse. His increased stability of mood has improved his medication compliance and reduced the anxiety and paranoia he experiences. As Mr. Winbush continues to gain momentum in his treatment he has been able to leave the house and has started to consider a small step by small step return to the world of work.

In retrospect, I am a bit suprised to have to be again  writing this letter in support of Mr. Winbush's receiving SSI   As the Director of an established Day Treatment Center, I come in direct clinical contact with many clients who struggle with the symptoms similar in nature and intensity as Mr. Winbush.  These clients have received solid support from the Social Security System for many years.

This clinics diagnosis from it's first introduction to Mr. Winbush to the present has always been that of Bipolar Disorder.  The symptoms of this disorder have prevented his gainful employment for well over 12 months.  I strongly support Mr. Winbush's appeal for supplemental Security Income benefits.

Sincerely,

Chris Young, LICSW

# SOUTHEASTERN MASSACHUSETTS NEUROLOGIC ASSOCIATES

45 Resnik Road — Suite 205
PLYMOUTH, MASSACHUSETTS 02360

—

LEE CORWIN, M.D.
DONALD MARKS, M.D.

(508) 746-4240
FAX (508) 746-4683

EUGENE ROE, M.D.

December 16, 1999

Frank Finkelstein, M.D.
110 Long Pond Road
Plymouth, MA 02360

Re: Shawn Windbush

Dear Frank:

I saw Shawn Windbush today in neurologic consultation accompanied by his wife of seven years. This pleasant, 32 year old, right-handed, married black male, father of four (ages 7, fraternal twins of opposite sex age 12, and another child age 13) is generally in good health. He comes to me with a history of difficulties with cognitive processing, including memory and word finding difficulties, that he has had subsequent to a head injury in 5/98.

Apparently, he was the victim of a robbery/kidnapping of sorts. He was visiting his former home area on Blue Hill Avenue. Apparently, he was wearing some jewelry and carrying some money. He believes this may have been the basis for his having been essentially bound and gagged and dragged into a car. In retrospect, he is unclear if these captors were planning on dumping him out of the car near his home or at some other pre-arranged location. When I asked him if this had been for revenge, he denied this, stating that he vaguely knew some of these folks, but did not know them specifically in terms of any personal relationship. He has had problems getting legal action on this and has deferred on it further. He tells me that he managed to get himself out of the car while still bound on Route 24 going an estimated 65 miles per hour. He believes he was unconscious for minutes and then remembers seeing some people around him. He describes himself as being quite angry and probably verbally profane at the time. He believes he was taken to the Deaconess Hospital (his wife corrects this as the Beth Israel Hospital). He apparently had some form of evacuation of hemorrhage in the posterior portion of the brain. He claims he was at the Deaconess Hospital for seven days and then went home.

He did have neuropsych testing two to four months after the accident. He is scheduled to have this again at Braintree Hospital in the near future. He is followed by Dr. Christopher Young as well as Louise Chandler (MSW) through Pembroke Hospital.

He had always had some trouble with impulse control, but his worsened after his accident. He was placed on Depakote, which he takes as 1000-750 mg. per day with excellent result. He is on Risperdal one-half tablet before bedtime and was started on a new sleeping pill as he has had some trouble with sleep.

WINDBUSH, Shawn                                                                              -2-

His psychosocial history is somewhat checkered. He is the youngest of six children. He was raised in Roxbury. He quit school in the ninth grade and wanted to go into the military. He claims he was in the Army National Guard for nine years. He got involved in guns and drugs. I did not press him on strong details of this. In any case, he was incarcerated at the South Bay House of Correction, then transferred to Plymouth and decided to live here after that as his wife had moved down to be closer to him while he was in prison.

He does acknowledge still smoking some marijuana and occasional cigarettes. He has three to four beers on average a night, sometimes six to seven if he goes out. He and his wife had been together for many years before they were married. He does not describe particular discord at this point.

He was physically abused as a child and probably had some difficulties with spousal abuse earlier in adult life, but has done well with this, he claims. He took a shot to the jaw in a barroom fight in 1993 or 1994 and was knocked briefly unconscious, but has no other history of loss of consciousness.

He has occasional headaches which were more prominent when he was younger, less so in adulthood and then a little bit worse recently. He describes these as being sinus-type headaches which he feels oftentimes behind the left eye. He does not describe nausea or vomiting with them. He does not describe any specific visual change with them. He has noted that he has some difficulties when he looks over quickly to the left that he feels as though his eyes are dragging behind his head a little bit.

He is aware of having some higher cognitive difficulties. He describes having trouble with memory as well as word finding difficulty. He describes himself as having been very verbally facile when he was younger and simply doesn't feel that he is quite the way he was. His wife confirms this. On the other hand, his behavior has been under very good control overall since he has been placed on the Depakote.

He had been working as a gas attendant and in food services as well as having some skills acquired in the Army National Guard. He is currently not working, I gather due to behavioral issues which limit his capacity to work.

On examination this is a pleasant, cooperative, generally soft-spoken, powerfully built adult black male in no acute distress. His head is normocephalic and atraumatic aside from an irregular scar over the right posterior cervical cranial region. Neck is relatively supple, full range of motion, non-palpable thyroid, full carotids without bruit. He has a notable tattoo with his name over the area of the left carotid. His mental status exam showed him to be fully alert and oriented. His proverb interpretation is very crisply and quickly abstracted. His performance on complex calculations was also quite quick.

WINDBUSH, Shawn                                                                      -3-

He was a little bit vague initially on the EgyptAir crash, but then did realize that the crash had something to do with possible criminal activities of the copilot, as he put it. At first he didn't know how many people had been killed and then said "200 something". He knew six firemen had been killed in the Worcester fire. He thought that Vice President Gore had been there, but he wasn't sure about the President. He easily recalled 3/3 objects at five minutes and then again after a ten word superspan word learning task. On the ten word superspan word learning task, he got 6/10 objects on the first iteration. I complimented him on his performance and then for the next two performances generated 4/5 in a somewhat random fashion also including perhaps a bit of proactive interference with apple (from the three word list inserted into the ten word list). His drawing of intersecting pentagons was nicely done. His affective range was normal spontaneously and on request. There was no frontal release. His language screen showed generally fluent, non-paraphasic spontaneous speech with repetition naming intact. At times there was perhaps a hint of blocking for certain words, but not clearly out of normal range, merely noticeable based on his own recounting to me of being generally verbally quite facile.

Cranial nerves II-XII were tested and found to be normal, specifically benign funduscopic exam and symmetric and reactive 3 mm. pupils. I did not discern any abnormalities of eye movement with rapid saccades or pursuits.

Motor strength testing was 5/5 throughout with normal bulk and tone. Sensory exam was intact to primary and corticosensory modalities. Coordination and gait were unremarkable including high level tandem. Reflexes were 1+ at the left knee, trace at the right knee with trace ankle jerks, downgoing toes, trace reflexes symmetrically in the arms.

Impression: Shawn presents with a neurological examination which is quite normal elementally. He does report having some difficulties with rapid visual movements off to the left side. It is certainly possible that he might have had some intrusion into the brain stem to parietal occipital pathways related to what was either a subdural hematoma or intraparenchymal hemorrhage from his accident of 5/98. This may slowly improve with time. There is nothing specifically we can do for it. I don't think it is of significant functional import for average life and work circumstances.

With regard to his behavior, I think it would be most useful to have further neuropsych testing. I found this man to be fairly bright. Obviously, he has had a fairly complicated psychosocial history. However, he describes himself as having been a good student when he was quite young before he got into trouble in his teens. I found him to still have quite a bit of verbal facility such as demonstrated on proverb interpretation. There was perhaps the possibility of elaboration on the ten word superspan word learning task as described above in terms of the type of performance and error. On the other hand, he may well have some higher level concentration and mental manipulation difficulties.

I am at somewhat of a liability in not having his previous head scans to know exactly what injury was sustained. Nevertheless, based on the history as presented, I don't think it would fundamentally change the approach to therapy.

WINDBUSH, Shawn                                                                    -4-

In terms of his mood, he is currently doing pretty well on his current medications. Depakote is the appropriate agent for management of impulse control disorder. I think that he should remain on it for the time being.

He did have a sleep-deprived EEG done at our office on 11/19/99. I reviewed this. Lee Corwin read it as showing some occasional right posterior quadrant slowing. I think that this is a minimal abnormality at worst. It certainly would be consistent with prior head injury. I do not believe that he is having seizures or seizure-like phenomenon.

I think that the continued follow-up by Dr. Christopher Young and Louise Chandler would seem most appropriate. I will see Shawn on an as needed basis. I have tried to reassure him that ultimately his cognitive deficits are likely to slowly improve over the years and that he is probably best to try to work around them at this point rather than becoming frustrated by what he might not be able to do as well as before the accident. Thank you for your referral.

Sincerely,

Donald S. Marks, M.D.
(Signed in his absence)

DM/nc:cz
(Dictated but not re-read)
cc:     Shawn Windbush
        125 Lake Drive
        Plymouth, MA  02360

**BOSTON Med Flight**

**31 FARGO STREET • BOSTON, MA 02210**
**Telephone: (617) 695-0771**

FLT # 98114l
DATE 5/29/96
☐ HOSP ☒ SCENE ☐ OTHER

| NAME | | FIRST | DOB | WT/KG | SSN | | PHONE |
|---|---|---|---|---|---|---|---|
| Winbush | | Shawn | 11/5/67 | 90 | 018588160 | | |

ADDRESS 58 Pearl St
CITY Manomet   STATE MA   ZIP

VALUABLES
☐ RECEIVED
☐ NOT RECEIVED

| TRANS. FROM UNIT | REFER TO SERVICE | TRANS. TO HOSP/UNIT | ADMIT MD | INCIDENT/DATE AND TIME |
|---|---|---|---|---|
| Bridgewater CC + AME | | BIDMC East | Libstein | 5/29 |

ARRIVE CODE 814   E CODE   ICD-9 CODES 853
REC HOSP # 1789915   EQUIP/VAL LBB HIB ST×2 Collar

| TIME | B/P | PULSE | RESP | GCS | SPO₂ /ETCO₂ | | | |
|---|---|---|---|---|---|---|---|---|
| 1757 | 154/87 | 58 | 18 | 8 | 100 | | | |
| 1805 | 175/127 | 94 | 14/0 | 3TB | 96 | Fen 100mcg IV #941   Incg Pavulon IV #941 | | |
| | | | | | | Succ 100mg IV #941 | | |
| 1810 | 212/103 | 93 | 14/ | 3TB | 90 | Fen 100mcg IV #941 | | |

TEMP   MEDS unk   ALLERGIES unk   PMHX unk

apparently

Per ALS B.M. passenger high speed vehicle tied up &
pushed out onto hgwy - found unresponsive → combative
MAE ∅ following commands (+) halo test R ear
SBP 160 100's NRB
O- Pt on cot Full CSpine immobilized on hgwy.
Resp- Spontaneous shallow chest exc (=) O sec air TVol ↓
SpO₂ 96's on NRB.
Cardiac - CMI - NSR HR 62. 2+ ×4 peri pulses. diaphoretic
Neuro: ∅ follow commands ∅ verbal MAE. PERRL-
sluggish R nystagmus (+) teeth clenched. mod. blood R tymp.
GI - Abd flat firm ∅ distended
GU pelvis intact ∅ W/ emesis. M.S. 2#16 IV R+L AC.
NS ↑. Abrasion LLE, bil. arms, face.
A- Multi Trauma CHI
P- ① Secure airway RSI in A/c 1st attempt #942 8.0 OETT
+ visual cords / ETCO₂ 35's, bil. chest excurs SpO₂ 100's
secured @ 23 mL   BUETT 100's ② Decompress Abd #18 OG.
③ S.B. / warm IVF to SBP > 100 ④ Fentanyl for
analgesia ⑤ Maintain CSpine - immobilize.
I/E BUETT c ease SpO₂ @ 100's ⑥ fasculations
noted inline CSpine maintained SBP > 150.
Transfer to Trauma Team BIDMC

I/O PRIOR TO TRANSPORT
I   CRYS: 100 ev's
O   ∅
I/O DURING TRANSPORT
I   CRYS: 100 ev's
O   ∅
CALL REC'D 1734
DISPATCHED 1736
CLEAR 1818
OAH 1809

| ALT 010 | PILOT NAME John Marden 903° | RN Pam DeVellis 922° |
|---|---|---|
| D/A | TEAM | EMT Roberts Palmer 941° |

WPI 10192 1M

To Whom it May Concern:                    2/4/06

My name is Shaunette Wibish, the daughter of Shaun Wibish. For as long as I can remember, my father has been a very loving, caring, family-oriented man. He has always had an active role in my and his three other children's education, recreational sports and life in general.

He has always been a giving person, with serving in the Army; and is currently a veteran. About a year ago, he just returned home from being stationed in New Jersey.

My dad has always provided and been for his family. My dad has always supported and helped me in anything I've ever needed. He is a great man and I hope you can take this into consideration the things I have told you. Thank You.

Sincerly,

Shaunette Wibish